## PHILADELPHIA RUBBER WORKS CO. v. U. S. RUBBER RECLAIMING WORKS et al.*

(Circuit Court of Appeals, Second Circuit. November 16, 1921.)

No. 13.

1. **Appeal and error ⬅1097(1)—Validity and infringement not re-examined on appeal from accounting.**

   The issues of validity and infringement, which had been decided on a previous appeal, will not be re-examined on appeal from the decree rendered after the accounting to fix the damages.

2. **Patents ⬅312(3)—Evidence held to show essential value was derived from infringement.**

   In a suit for infringement of a patented process for devulcanizing rubber, evidence *held* to show that defendant's product essentially derived its marketability and value from the unlawful appropriation of the patented processes.

3. **Patents ⬅318(3)—Process covered by patent to another is not a standard of comparison.**

   In determining the profits of an infringer, other methods of accomplishing results of the patented process cannot be used as standards of comparison, if such methods were covered by other patents, so as not to be available to defendant.

4. **Patents ⬅318(3)—Standard of comparison must have been open to use prior to plaintiff's patent.**

   The standard of comparison for determining profits earned by an infringement must be one which was known and available to the infringers' use prior to date of plaintiff's patent, or at least prior to the date of appropriation.

5. **Patents ⬅318(3)—Process subsequently developed to avoid infringement cannot be standard of comparison.**

   A process, developed by defendant after injunction against infringement was issued to avoid the infringement, cannot be adopted as a standard of comparison in determining the profits due to the infringement.

6. **Patents ⬅312(1)—Infringer has burden of showing portion of profits not resulting from infringement.**

   On an accounting to determine the damages from an infringement, the infringer is liable for all his profits unless he can show, and the burden is upon him to show that a portion of them resulted from something other than the patented process.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
* Certiorari denied 256 U. S. ——, 42 Sup. Ct. 187, 66 L. Ed. ——.

7. **Patents ⬳318(4)—Profits from finishing held not separable from infringing use.**

In a suit for an infringement of a patented process for devulcanizing rubber, where the essential marketability of defendant's product resulted from the use of the patented process, the profits resulting from the finishing and refining could not be separated from the profits resulting from the infringement, so that plaintiff can recover the total profits.

8. **Patents ⬳318(6)—Profits on compounds mixed with infringing products properly disallowed.**

Where the infringer of a patented process for devulcanizing rubber compounded his rubber after the vulcanizing was completed with other chemicals, but sold the whole product at the market price for rubber, he cannot claim that a portion of his profits was a profit on the compounds used, but is entitled to deduct only the cost of the compounds.

9. **Patents ⬳318(6)—Special expenses held not deductible from infringer's profits.**

In determining the profits earned by an infringer, special payments made by the infringer to its officers, in addition to their regular salaries, legal expenses incurred in defending the infringement suit, and expenses of reorganizing the infringing corporation, cannot be deducted from the gross profits.

10. **Patents ⬳318(6)—Apportionment of expenses to infringing product held correct.**

In a suit for infringement of a patent, apportionment by the court in ascertaining the profits of the infringer of the expenses, so as to charge one-half to the mill using the patented processes, *held* proper.

11. **Patents ⬳318(6)—Interest on capital used in infringing business is deductible.**

In determining the profits of an infringer, interest on the capital invested in the infringing portion of defendant's business was properly allowed as a charge against the gross profits from the infringing product.

12. **Patents ⬳318(5)—Interest not charged to innocent infringer prior to decree.**

Where the infringement was not willful and deliberate, it is inequitable to charge interest on the award of damages from the date of infringement, and interest was properly allowed from the date of the decree, where proof was taken by the court after the master's death, and the findings were made by the court.

13. **Patents ⬳287—Purchaser of infringer, assuming debts, held liable for infringement.**

In a suit for infringement of a patent, a corporation which purchased the business of the infringer while the infringement suit was pending, and assumed and agreed to pay all its debts, was liable to complainant, though the promise to pay the infringer's debts was not made for the plaintiff's benefit.

Appeal from the District Court of the United States for the Western District of New York.

Suit by the Philadelphia Rubber Works Company against the United States Rubber Reclaiming Works and others for infringement of a patent. From a decree fixing the amount of damages for the infringement after an accounting (276 Fed. 600, 613), both parties appeal. Affirmed.

Charles Neave and William G. McKnight, both of New York City, for plaintiff.

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Hans v. Briesen, of New York City (J. Edgar Bull, of New York City, Simon Fleischmann, of Buffalo, N. Y., and Alexander B. Siegel, of New York City, of counsel), for defendants.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

MANTON, Circuit Judge. For convenience we will refer to the parties herein as plaintiff and defendants. The plaintiff and defendants have each appealed from a final decree awarding the plaintiff the sum of $324,597.46 as profits which were realized by the defendants during a period of five years, due to infringement by defendants of plaintiff's patent. The plaintiff appeals for the reason that it contends that the award to it should have been for a larger sum.

The plaintiff instituted the suit originally against the United States Rubber Reclaiming Works for infringement of the Marks patent, No. 635,141, which it owned. This patent involves a process for devulcanizing rubber waste. It was held valid and infringed in the District Court (225 Fed. 789), and this result was affirmed on appeal to this court (229 Fed. 150, 143 C. C. A. 426). The court decided that the Marks patent accomplished a new result by the application of a new process to the reclaimation of rubber waste. The United States Rubber Reclaiming Works conveyed its business and property to the United States Rubber Reclaiming Company, Inc., and later the United States Rubber Reclaiming Company, Inc., transferred its assets and business to the Madison Tire & Rubber Co., Inc. It became necessary to file supplemental bills when each of these transfers took place, bringing in the transferees as codefendants.

The proof as to damages and profits was taken before a master, who died before the completion of his work. Such testimony was submitted to the court, who heard the balance of the proofs offered, and the decree from which this appeal is taken was entered. The court ruled that there was no standard of comparison from which to estimate the profits, and that the plaintiff was entitled to recover the entire profits made by the defendants from reclaimed rubber produced by the infringing process. It refused to allow a deduction of $179,309.24 for alleged profits on the compounds which the defendants claim that they incorporated into the reclaimed rubber sold. It refused to allow the defendants a deduction of $75,946.24 for alleged profits made from operations subsequent to the devulcanizing process, which operations are usual and customary in reclaiming rubber to put the product in condition for sale. To the sum agreed upon by the accountants as the basic figure of profits $610,581.66, the court added $10,982.48, a proportion of $21,507.30 which was deducted in fixing said sum as special expenses, and a proportion of the sum of $21,004.18 legal expenses, and a proportion of the reorganization expenses of $3,461.71. This was held to be improperly charged to the cost of the operation with the infringing process. This is chargable, as proportioned, to mill No. 2. He also added all of the loss—$10,982.48—incurred by the defendants during the first 18 months of the operation of the infringing process.

The District Court reduced the profits by $122,932.57, apportioning certain expenses between the infringing and noninfringing processes; that is, it divided the general expenses equally between the defendants' two mills and allowed this as a deduction. The plaintiff claims that it should have followed the method adopted by the accountants jointly representing the parties. The court allowed a reduction of $197,200.72 for interest on capital invested in the plant and business using the infringing process. It disallowed interest on the judgment, except from the date of the entry of the decree.

It is claimed by the defendants that the court erred in making the Madison Tire & Rubber Company, Inc., a party and, in entering the decree requiring payment of the damages by it.

[1] The process of the Marks patent for devulcanizing rubber waste consists in submerging the finely ground rubber waste in a dilute alkaline solution in a sealed vessel, and in keeping the contents of the vessel at a temperature of 344° F., and in maintaining this temperature for 20 hours, more or less. This court held that the defendants appropriated the essential elements of this process and thereby achieved the same result as the Marks patent accomplishes. It therefore held it was an unlawful appropriation of the same. We are not called upon, in the review on this appeal, to examine the question of validity or infringement. Smith v. Vulcan Iron Works, 165 U. S. 525, 17 Sup. Ct. 407, 41 L. Ed. 810; Illinois v. Illinois Central R. R., 184 U. S. 77, 22 Sup. Ct. 300, 46 L. Ed. 440. Both are established against the defendants by the previous decision of this court.

The Marks process opened a new field for production of reclaimed rubber; that is to say, rubber from highly vulcanized scrap. This had never previously been successfully accomplished. By the acid process, rubber had been reclaimed from boots and shoes and made capable of being used for other purposes. But from the reception of the Marks process in the trade, and particularly by the large companies, and the results accomplished by it, it is apparent that this process was of great monetary and economic value, particularly in reclaiming rubber used in automobile tires. The main ingredients of rubber goods of various kinds are crude rubber, reclaimed rubber, sulphur, and so-called compounding ingredients, which are of a mineral nature, such as oxide of zinc, barytes, and whiting. The properties and their nature which go to make up the rubber articles are dependent upon the nature, amount, and quality of these various constituents. The mineral compounding ingredients, which are added to the rubber, are for the purpose of imparting various characteristics to the manufactured article, such as color, good wearing qualities, etc., and the sulphur is added for use in the vulcanizing process to which it is essential that rubber should be subjected.

Vulcanization, in general, consists in incorporating sulphur into the rubber and subjecting the mixture to heat. There are basic methods of vulcanization, according to whether the heat treatment is carried on under atmospheric pressure or increased pressure. Vulcanization brings changes in the properties, and the physical properties vary ac-

cording to the method of vulcanization. The process in question has to do with the method of devulcanization.

There are two basic methods which have been employed for this purpose; one, the acid process, consisting in grinding the rubber, subjecting it to a dilute solution of sulphuric acid at a temperature above the boiling point of the solution, and continuing this treatment until the destruction of the cotton fiber that may have been in the scrap is completed. The mass is thereupon washed until the acid has been completely removed. It is subsequently placed in a devulcanizer and subjected to the action of live steam at a pressure of approximately 100 pounds for a period of approximately 24 hours.

The other method is the alkali process of Marks, and consists in submerging the scrap rubber in a finely ground condition in a dilute alkali solution in what is known as a digester, which is a cylindrical kettle provided with a steam jacket. Subsequently, live steam under a gauge pressure of approximately 125 pounds is introduced into the jacket surrounding the digester, thus heating the contents of the digester, namely, the solution of caustic soda and the scrap rubber which is submerged in it. The digester is provided with a stirring device, in order that its contents may be kept under agitation. The heat treatment continues for about 20 hours.

In the acid process, the acid is used for the destruction of the fiber and is subsequently carefully removed by a washing, and during the heat treatment the scrap rubber is subjected only to a comparatively low temperature of live steam. In the alkali process, the scrap rubber is subjected to the caustic soda solution while it is being subjected to very high heat. The first is referred to as the two-step process, while the latter is the one-step process.

The acid process is not adapted for reclaiming highly vulcanized rubber goods, such as tires and mechanical goods scrap. The acid process, at the date of the grant of the Marks patent, was unprotected by patents because of the expiration thereof, and it could be utilized by the trade generally, and the record shows that the trade made efforts to reclaim tires and mechanical goods scrap by the acid process, but each failed to produce satisfactory results, and when the Marks patent came upon the market the companies engaged in this business acquired rights under that patent. The acid process was adopted, and widely and extensively used, in reclaiming boot and shoe scrap, which is only slightly vulcanized. The crude rubber possesses plasticity and ability to absorb compounding materials, which properties disappear on vulcanization, resulting instead in a product having high tensile strength and high elongation. It is this presence of plasticity and ability to absorb compounding materials which the reclaimer tries to restore to a maximum extent as a result of devulcanization.

Devulcanized rubber must, on subsequent vulcanization, show a maximum of tensile strength and a maximum of elasticity. The devulcanized rubber must not only possess a maximum plasticity and absorptive ability, but must not lose these properties with age, and the revulcanized reclaimed rubber must show high tensile strength and high elongation, and must retain these properties for a maximum period of

time. Tire scrap devulcanized by the acid process does not exhibit the properties of plasticity and ability to absorb compounding materials as is observed in the stock devulcanized by the alkali process. The result of practical experience shows that, on revulcanization, the alkali stock exhibits superior tensile strength and elasticity, and by virtue of these two properties, and also because of its increased plasticity prior to vulcanization, the alkali stock exhibits a superior abrasive resistance. The alkali revulcanized stock is superior to the acid stock as to aging. The result has been that the Marks patent is described in the record as one of the most successful and valuable rubber patents ever issued. The commercial success of this patent is striking.

The defendants started its infringement about February 1, 1911. It devoted mill No. 2 to this work. The only process used in this mill was the alkali process covered by the Marks patent. The law of the case has been clearly established, in the decision heretofore made, that mechanical scrap consisting of highly vulcanized material was not sufficiently devulcanized by any known acid process, but that in its use an inferior article was produced.

[2] It has been determined below that the process of the patent in suit accomplishes a new result by the application of this new process, and that, prior to the Marks process, scrap rubber, which had necessarily been highly vulcanized, was not sufficiently devulcanized or reclaimed by the acid process then familiar to the art. The new result of the Marks process also produces a product possessing characteristics different from those possessed by the acid reclaimed rubber. The court below, on this record, held properly that the defendants' product essentially derived its marketabiilty and value from the unlawful appropriation of the process of Marks. It therefore awarded the plaintiff the entire profits made by the defendants from the sale of reclaimed rubber produced by the Marks process.

We think the rule of damages applied by the court below was correct, and that there was no process in use or known which could be used as a standard of comparison as contended for by the defendants. The defendants' claim as to the process of 1906, affords no standard of comparison. It was adopted after December 3, 1915, upon the date the defendants were enjoined from the further use of the Marks process. This is the date of the discontinuance of the infringement. What was then used by the defendants was a two-step alkali process, which was more expensive than the one-step process of the plaintiff. It was a noninfringing process.

[3] There were patented methods by which rubber waste, consisting of automobile tires, could be reclaimed; but, because these methods were protected by patents, they were not open to the public, and could not then be a basis for recovery here. Amer. Pneumatic Co. v. Snyder (D. C.) 241 Fed. 274. The question to be determined in each case is, What advantage did the defendants derive from using the plaintiff's invention over what he had in using other processes then open to the public and adequate to obtain an equally beneficial result? In other words, the fruits of that advantage are his profits. Tilghman v. Proctor, 125 U. S. 136, 8 Sup. Ct. 894. 31 L. Ed. 664.

[4] The standard of comparison, to be applicable, must have been known and open prior to the date of the plaintiff's patent. Illinois Central Co. v. Turrill, 110 U. S. 301, 4 Sup. Ct. 5, 28 L. Ed. 154; Sessions v. Romadka, 145 U. S. 29, 12 Sup. Ct. 799, 36 L. Ed. 609. Some courts have held the date of appropriation of the invention by the defendant should be taken. Brown v. Lanyon, 179 Fed. 309, 102 C. C. A. 497; Columbia Wiring Co. v. Kokomo, 194 Fed. 108, 114 C. C. A. 186; Amer. Pneumatic Co. v. Snyder (D. C.) 241 Fed. 274. The field of selection of process which might be used should be, in principle, that which is open to the art at the time the invention is appropriated. Where there is a patent which forbids such use, the question is presented whether it is actually available to the infringer during the period of the infringement. Where the owner of the patent declines to permit its use or grant a license, it cannot be set up as a standard of comparison.

[5] Processes which were developed after the infringement as a substitute for use by the defendants cannot be used as a standard of comparison. This record discloses no process that might be used as a standard of comparison. The rule is therefore applicable which requires the defendants to pay over to the plaintiff all the profits which they derived through unlawful infringement. Westinghouse v. Wagner, 225 U. S. 604, 32 Sup. Ct. 691, 56 L. Ed. 1222.

[6] Where profits are made by the use of an article patented as an entirety, the infringer is liable for all the profits, unless he can show, and the burden is on him to show, that a portion of them is the result of some other things used by him. Elizabeth v. Paving Co., 97 U. S. 126, 24 L. Ed. 1000; Crosby v. Safety Valve Co., 141 U. S. 441, 12 Sup. Ct. 49, 35 L. Ed. 809.

[7] It is argued by the defendants that a small portion only of the total profit is due to the devulcanizing step, and that the balance is due to the finishing and refining steps performed subsequent to devulcanization. After the devulcanization of the scrap rubber, the devulcanized rubber is not immediately in condition for sale or use, but is subjected to finishing and refining steps. The defendants' argument is that, of the total cost of producing reclaimed rubber, which is sold, only 18 per cent. of that cost is incurred in the devulcanizing step; that the balance of the cost is due to the subsequent finishing and refining steps. But it is established by the record that the value of the product is due to the devulcanizing process; the reclaimed rubber produced by this process is given characteristics which are wholly different from the characteristics of acid reclaimed tire scrap.

These characteristics result in a new product, which could be attained only by depolymerizing the waste or breaking down the rubber molecules formed during vulcanization. The defendants could not have produced vulcanized rubber from highly vulcanized scrap possessing these characteristics, had it not used the Marks process. The fact is that the defendants could not have sold the reclaimed rubber, without first having imparted to that rubber the characteristics resulting from the use of the Marks process. This cannot be separated from the finishing and refining which helps to make the article marketable. It was

impossible for the defendants, without the wrongful use of the plaintiff's process, to carry on their operations as they did. Thus it appears that the entire commercial value of the rubber arises from the use of the patented process and the plaintiff is entitled to recover from the infringer the total profits derived. Mfg. Co. v. Cowing, 105 U. S. 253, 26 L. Ed. 987.

[8] It is urged that the District Court erred in not allowing deductions for alleged profits on compounds which were incorporated in the reclaimed rubber sold. In carrying on its business, the defendants' practice was that, after the completion of the devulcanizing step, and during the progress of the finishing and refining steps, they incorporated into the rubber a little over 7 per cent. of various compounding ingredients, and they now claim the right to deduct from the total profits the profit which they claim to have made on these ingredients. They claim the right to deduct from the net profits realized from the sales of the reclaimed rubber, the sum of $179,309.24. Defendants paid for these compounding materials $57,157.72. The reclaimed rubber, with its contained compounding ingredients, sold for about 20 cents a pound; but there is no proof to show that the defendants received more for the reclaimed rubber containing these compounds than they would have received for the same pure reclaimed rubber without the use of compounds, and there is no proof that these compounds, after being combined with the rubber, were of any greater value than when put in.

The defendants have been credited with the cost of the compounds. It was only possible for the defendants to use the compounds because the rubber was, by means of the infringing process, given a characteristic which created the ability to absorb compounds. The plaintiff had never at any time indulged in the practice of putting compounds in its alkali reclaimed rubber. It sold straight reclaimed rubber. Defendants, on the other hand, during the period of infringement, were selling to customers reclaimed rubber containing 7.13 per cent. of the total weight of compounds; that is, the customer, instead of getting 100 per cent. straight reclaimed rubber, was getting only 92.87 per cent., and was being charged the prevailing market rate for straight reclaimed rubber the whole 100 per cent. We think the District Court properly disallowed this claim for reduction on account of the profits for the compounding materials. It was necessary, in order to make the defendants' articles salable, to obtain the special characteristics which could only be acquired by the infringing process. The plaintiff's profits cannot be subtracted from by the subsequent addition of compounds. Carborundum Co. v. Electric Smelting Co., 203 Fed. 976, 122 C. C. A. 276.

The District Judge accepted, as a basic figure, the profit, $610,581.66, and required a further adjustment by adding thereto $21,507.30, special expenses, $21,004.18 for legal expenses, and $3,461.79, reorganization expenses, which had been deducted in arriving at this basic figure.

[9] The payment under the heading of "Special Expenses" was money to officers of the company who were drawing regular salaries

at the time of the payments. Payments thus made to officers over and above their regular salaries are not allowable. Lee v. Malleable Co. (D. C.) 247 Fed. 795. The legal expenses were for attorney's fees in defending the action for infringement of patent. Such fees are not allowed as a deduction. Nat. Co. v. Dayton (C. C.) 95 Fed. 991. Reorganization expenses were incurred for the reorganization of the defendants' business. This resulted in the necessity for bringing in several defendants as parties to the action because of the sale of the business of the original defendant. We do not think that this is a proper deduction.

[10] The court apportioned these deductions, adding one-half the total sum as a proper charge against mill No. 2. We agree with the action of the court.

[11] The court allowed $197,020.72 for interest on capital invested in the infringing portion of defendants' business. This was pursuant to the rule of law announced in Oehring v. Fox Typewriter Co., 251 Fed. 584, 163 C. C. A. 578. We think the court correctly ascertained the invested capital used in the manufacture of the reclaimed rubber with the infringing process in mill No. 2, and that the allowance of interest on such capital was properly ascertained and calculated. We likewise agree in the apportionment of the general expenses between the defendants' two mills and the allowance of $122,932.57 as a deduction. This division of the general overhead expense seems to us to have been divided equitably.

[12] This was not a willful and deliberate infringement. In view of the history of the litigation in the Sixth Circuit and the conduct of the defendants, we think it undesirable and inequitable to impose an interest charge on the award from the date of the infringement. The circumstances of the case make applicable the rule which allows interest from the date of the decree, because of the finding of the court. Proof was taken by the court after the master's death. Oehring v. Fox Co., supra.

[13] When the Madison Tire & Rubber Company, Inc., purchased the assets and the property of the United States Rubber Reclaiming Company, Inc., it agreed to assume and pay all debts, obligations, and liabilities whatsoever of the United States Rubber Reclaiming Company, Inc., and to indemnify and hold the United States Rubber Reclaiming Company, Inc., its officers, directors, and agents, harmless of and from the same. When this transfer took place, the Madison Company was cognizant of the pending action and fully acquainted with all the proceedings theretofore had. This was one of the obligations assumed by it and the defendant the Madison Tire & Rubber Company, Inc., may be charged as the principal debtor, because the grantee (the Madison Company) has agreed to be primarily liable for the grantor's (United States Company) obligation to the creditor (plaintiff). As between the parties to the agreement, the United States Company is the principal and the Madison Company the surety.

The plaintiff is entitled in equity to maintain this suit against the Madison Company to the same extent as the United States Rubber Reclaiming Company, Inc., could have maintained it. It is immaterial

whether the contract was made and intended for the benefit of the creditor (plaintiff) or of the United States Rubber Reclaiming Company, for the plaintiff has all the rights of both to enforce the obligation as against the Madison Company. Keller v. Ashford, 133 U. S. 610, 10 Sup. Ct. 494, 33 L. Ed. 667; Silver King C. Mines Co. v. S. K. M. Co., 204 Fed. 166, 122 C. C. A. 402, Ann. Cas. 1918B, 571; Dancel v. Goodyear Shoe Machinery Co. (C. C.) 137 Fed. 157. In this action in equity, we think the Madison Company was properly made a party defendant, and that the decree below was proper.

For these reasons, the decree is affirmed.