## ARMSTRONG v. BELDING BROS. & CO.

(Circuit Court of Appeals, Second Circuit. February 4, 1924.)

No. 210.

**1. Appeal and error �găm1017—Master's findings of fact on conflicting testimony must be treated as unassailable.**

Findings of a master on all debatable questions of fact must be treated as unassailable, but this does not preclude the appellate court from examining the principles or methods controlling the master's investigation of facts.

**2. Evidence ⟩⟨⟩75, 179(2)—Where defendant refuses to produce the best evidence, his cause is exposed to the presumption that it would tell against him, and court may consider the best available.**

Where a defendant has failed or refused to produce the most satisfactory evidence, he leaves his cause exposed to the presumption that, if produced, it would tell against him, and compels the court to rely on less definite and certain evidence.

**3. Patents ⟩⟨⟩318(4)—Where infringing part alone makes article marketable, infringer is liable for entire profit.**

Defendant, in a suit for infringement of a patent for a silk skein holder, which used the infringing holder for its product only when it could not make a sale without it, held liable for the entire profit made on such packages.

**4. Patents ⟩⟨⟩318(5)—Interest on profits recovered for infringement held allowable from date of master's report.**

Interest on profits recovered for infringement held allowable only in the usual way from the date of the master's report, where it is doubtful whether defendant was a wanton infringer in a legal sense, and where complainant was chargeable with unnecessary delay in prosecution of the suit.

Appeals from the District Court of the United States for the District of Connecticut.

Suit in equity by Benjamin L. Armstrong against Belding Bros. & Co. Decree for complainant, from which both parties appeal. Affirmed.

For opinion below, see 280 Fed. 895. Certiorari denied 44 Sup. Ct. 459, 68 L. Ed. ——.

The decree appealed from results from the accounting begun before this court affirmed decision on the merits in November, 1909. 174 Fed. 410, 98 C. C. A. 361. Suit is for infringement of plaintiff's patent 546,251, for a "skein thread holder." Very full statements of meritorious novelty in this invention are found in our previous opinion and that of the court below. 172 Fed. 234. For present purposes it is enough to emphasize the holding, made so long ago, that, while skeins of thread or silk were old and well-known articles of commerce, plaintiff's holder furnished so convenient and economical a method of selling, preserving, and having ready for instant use the threads of silk that the old silk in the new holder became almost, if not quite, a new article of commerce; it at least commanded a market of its own.

The accounting herein began while the appeal was still pending. In January, 1913, the master filed his first report, which was set aside in the following October, with instructions to the master. In December, 1913, defendant filed what was called an account. Not being satisfied with this account, the master in January, 1914, ordered the defendant to produce certain described books, vouchers, etc. This order not being complied with, it was enforced by the court; but, instead of complying, the defendant showed by

⟩⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

affidavit that the books had either been lost or destroyed, and it may be summarily said that the books of account or other original memoranda tending to substantiate the account filed by defendant never were produced. The master reported in December, 1919, awarding to plaintiff $95,794.73, and to this report the defendant promptly filed exceptions.

In May, 1922, the District Court modified the master's findings by subtracting therefrom $31,369.80. Final decree accordingly in the plaintiff's favor for $64,424.93, with interest from the date of the master's report, was entered on the 7th of June, 1922. The transcript of record on appeal was filed in this court in October, 1923. The brief of the plaintiff on this hearing states that there has been "considerable delay, due to unavoidable causes; but there was also a great deal of delay, due to the fact that the proceedings were not prosecuted by either party as vigorously as they might have been." With the addition that the record discloses no "unavoidable causes of delay," the truth of the defendant's naive remark is quite obvious.

Defendant appealed from the award as made, and plaintiff against the modification of the master's finding made by the court below.

Gifford, Bull & Scull, of New York City (Livingston Gifford, of New York City, of counsel), for plaintiff.

Robert B. Honeyman, of New York City, for defendant.

Before HOUGH, MANTON, and MAYER, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). [1] We are not disposed to depart from the rule that the findings of a master, involving questions of fact and depending upon the weighing of conflicting evidence, are entitled to that reasonable presumption in their favor which attaches to the findings of a referee or the special verdict of a jury; indeed, it may be said that on all debatable questions of fact the master's report must be treated as unassailable. Tilghman v. Proctor, 125 U. S. 136, 8 Sup. Ct. 894, 31 L. Ed. 664; Davis v. Schwartz, 155 U. S. 631, 15 Sup. Ct. 237, 39 L. Ed. 289; Westinghouse v. Wagner (C. C. A.) 281 Fed. 453. This, however, does not mean that the appellate court has no duty to examine the principles controlling the master's investigation of facts, and sometimes the results announced by a master are in themselves so surprising as to suggest investigation of his principles or methods.

It is urged that in this case surprising results require investigation, for the result of the decree appealed from is that defendant made a profit of about 43 per cent. on what it sold in defiance of plaintiff's patent; while, if the master's report had stood as filed, it meant that defendant had similarly made a profit of upwards of 55 per cent. Yet the business of making and vending silk in every form is very old and highly competitive, and what defendant sold here was the same silk usable for the same purposes as the skeins of prior commerce. The only change was in the form of container, and that container per se was an inexpensive paper envelope. We have therefore carefully examined this record, to ascertain how and why it was that these results were reached.

[2] The proceedings before the master, however prolonged, are not bulky, and the method of decision is easily seen. The radical difficulty with defendant's case is that it never exhibited, either by oral evidence or documentary proof, just how much it cost to get the silk, treat it, put it in containers, and sell it. We are in some doubt wheth-

er this was a refusal to give evidence, or an inability to get evidence. A blunt statement that books and other records which would have cast light upon the matter had been lost in the removal of offices from one building to another in the same city was not persuasive to the master, and is not persuasive to us, when it is admitted that such removal and consequent loss took place while this litigation was going on, and while, therefore, the exigency of the cause should have been present to the minds of the responsible officers of defendant.

We are compelled to think defendant open to the rule, often stated, but never better than in Yesbera v. Hardesty, 166 Fed. 120, 92 C. C. A. 46, that where a defendant has failed or refused to produce the most satisfactory evidence he leaves his cause exposed to the presumption that, if produced, it would tell against him, and compels the court to rely on less definite and certain evidence. As Severens, J., there remarked, if in the absence of the better proof "there is still nothing of substance left on which the court can lay hold, there is no help, and the plaintiff must endure his loss." If in this case the master had had only what defendant furnished, it amounted by way of assertion to a statement that defendant lost money by infringing, and by way of proof it amounted to nothing at all.

But the article made under this patent was produced and sold by the licensee, a large and well-known manufacturing establishment with which plaintiff is concerned. That factory knew and could prove facts about the silk market, and its own costs and expenses in turning raw silk into silk thread, putting it in holders, and offering it for sale. Defendant also is a large, long-established, and well-known manufacturer of similar articles, and, as above noted, silk thread is a standard article, competitively produced. Accordingly plaintiff furnished substantially all the evidence as to the cost of getting, manufacturing, and otherwise preparing for sale the patented article. No reason appeared from the nature of things, or the nature of the businesses of plaintiff's licensees and defendant, why costs should not be substantially the same for both, and defendant furnished the billed price at which the infringing goods left its factory. To this evidence, so far as it came from the plaintiff, defendant offered no rebuttal worthy the name.

We conclude that, surprising as the result may be, defendant is in no position to complain about it. We incline to the view that it has deliberately made its own bed and had better lie on it. Therefore we see no reason for disturbing the fact findings of the master.

The reduction of $31,369.80, made by the court, we likewise agree to. This sum the master had reached by finding (in effect) that every pound of silk sold in the infringing holders by defendant had gone through what the report calls "its sales offices in New York, Boston, Baltimore, Cincinnati, St. Louis, and Chicago," and ultimately brought in $2.64 a pound more than the factory billing price. He accordingly assessed defendant that increment. This assumes that these sales offices in the cities enumerated were all mere agencies of defendant, so that the money which they took in from customers was defendant's money.

Whether this is true depends on whether all these places were mere agencies. We agree with the court below that most of them were independent merchants; so that, while they owed the defendant the price at which the goods were billed to them, what they got from the customers was their own money. We incline to think that some of them, at least the one in New York, was a mere agency or branch of defendant; but the record furnishes no satisfactory method of allocating or segregating the goods sold to consumers in the several establishments.

[3] Having adopted the figures of the court below, the principle question remains; i. e., whether this is a case for applying the rule most authoritatively stated in Westinghouse, etc., v. Wagner, 225 U. S. 604, 32 Sup. Ct. 691, 56 L. Ed. 1222, 41 L. R. A. (N. S.) 653, and by this court repeatedly from Wales v. Waterbury, 101 Fed. 126, 41 C. C. A. 250, to Vandenburgh v. Concrete, etc., Co., 278 Fed. 607, to wit, that:

"An infringer is liable for the entire profits made by the manufacture and sale of an article containing the patented device, where it appears that, but for the patented feature, the article would not have been salable."

The ruling was applied in the Vandenburgh Case, supra, by asserting that:

"It is entirely clear * * * that defendant would never have sold a dollar's worth of its devices, had it not availed of plaintiff's patent."

It is quite properly urged upon us that what defendant sold was silk; it was the same silk that had been sold for years in the old-fashioned skein. To be sure, it was sold in infringing holders; and it is argued that, even if the holders did give increased attractiveness to the product, it was perfectly possible to allocate a certain part of the price obtained for silk in holders to the silk, and a certain other part to the holder, and accordingly that the profit on the holder is all that the plaintiff can demand, and in advancing this argument great reliance is placed upon our recent decision in Metallic, etc., Co. v. Hartford (C. C. A.) 275 Fed. 315.

As to this last case, it is enough to point out that the question of applying the rule must always be one of fact, and that in the Metallic Rubber Case we held as a fact (page 321):

"We * * * are far from finding in this record any evidence whatever that the entire value of the infringing tires was properly and legally attributable to the presence of the [patented] wires in the treads. We are quite unable to say that without that device there would have been no market for the tires, and that the defendant's structure would have been non-commercial."

In a somewhat novel way, the exact opposite is the truth here. There are many different methods of creating value, and many reasons for salability. Here it was found below, upon the testimony of defendant's officials themselves, that they did not wish to sell the infringing article; they sold under compulsion, viz. the compulsion of their own customers. Men had been long accustomed to buy from defendant its skein silk; it was a well-known and reputable article of commerce; the same men came to defendant to get the same silk and could get it, but they told defendant they wanted a certain quanti-

ty of silk in holders; it was comparatively a small demand, but they wanted it in addition to the old-fashioned skeins, and they wanted it in order to be able to supply a demand that had been created by plaintiff's sale of its silk in holders.

If defendant had said to one demanding 100 pounds of silk in skeins and 4 pounds in holders, "I cannot furnish you with the holder silk, but I will give you 104 pounds of skein silk," the sale would not have gone through; defendant says so, in effect. Defendant was afraid that, if it could not furnish the 4 pounds of silk in holders, it would not long hold the customer for the 100 pounds of skein silk. This seems to us to be within the letter of the Wales and Vandenburgh Cases, supra; it is certainly within their spirit.

Defendant sold infringing holder silk, not for the sake of the silk, not to advance its own business, but to keep what it had, and prevent plaintiff's licensees from keeping, not only the holder silk trade (of which it had lawful monopoly), but quite likely getting much of defendant's skein-silk business, because customers who wanted both kinds would go where they could get both at one time. Value is a word largely equivalent to desirability, and what rendered holder silk desirable was the holder. A certain small proportion of silk thread was wanted in holders, solely for the sake of the holder—so clean, economical and convenient; defendant supplied that want.

What created the demand so supplied was not the desirability of the old silk, but that of the new holder, and the language quoted above from the Vandenburgh Case is wholly applicable; defendant would not have sold a pound of holder silk, had it not availed itself of plaintiff's patent. Therefore it must pay all the profit it made on sales so made.

[4] Application is made for interest from an earlier date than that of the master's report, on the ground that infringement was wanton and deliberate. Metallic, etc., Co. v. Hartford, supra, at page 325. We there held that, under circumstances of wantonness, interest *might* be so allowed; i. e., such allowance was discretionary. In this case we point out (1) that suit was brought on two allied patents, and defendant was victorious as to one of them only after appeal; and (2) that the snail-like course of this cause through the District Court does not commend itself to any one desirous of promoting speedy justice, and plaintiff is, if possible, more to blame for delay than defendant.

Therefore, because we doubt whether in the legal sense defendant was a wanton infringer, and because we are not disposed to exercise discretion in favor of dawdling delay, we decline to grant interest other than in the usual way.

Other points have been argued and considered, but it is not deemed necessary to dwell on them.

Both parties having appealed, decree affirmed, without costs in this court.