## CINCINNATI CAR CO. v. NEW YORK RAPID TRANSIT CORPORATION.

Circuit Court of Appeals, Second Circuit. November 11, 1929.

Rehearing Denied December 2, 1929.

No. 42.

H. A. Toulmin, of Washington, D. C. (H. A. Toulmin, Jr., of Washington, D. C., and C. C. Daniels, of New York City, on the brief), for appellant.

Harry E. Knight, of Washington, D. C. (William E. Knight, of New York City, on the brief), for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge. The first patent was for a vestibule between two cars in what is called an "articulated train." This means that the adjacent ends of each car on the train are carried by a single truck, thus avoiding the need of two trucks for each car, and requiring but one more truck for the train than there are cars. The patent discloses such a train (part of which is the subject of the third patent), but claims only certain features of the vestibule, which secure to the passengers a safe passage from car to car. To insure this it is necessary that such a vestibule shall rotate on its axis with the lateral movements of the truck upon curves, that the openings in the car-ends shall be wide enough to embrace its upright sides, and that the embracing sides shall not intrude into the doorways as the cars turn in relation to the truck.

Elliott between the cars mounted a shell, preferably of sheet steel and cylindrical, with a floor and roof, through which at opposite sides doors were cut to allow passage. It rested ("floated"), without attachment upon the platforms of the adjacent cars which came close together at the points where each engaged the truck in a swivel joint. Thus the vestibule was held in place only by its own weight and by certain weather-strips or guards from the sides of the openings in the cars into which its cylindrical surface was set. To secure its registry, so to say, with the movements of the truck, it was fastened to an upper transverse member on the truck top, called the "bolster," by two rods passing from the inside of the shell through the floor into recesses made for that purpose on either end of the bolster. As the truck turned on the track, the vestibule must turn with it, rubbing over the surface of the car platforms on which it rested.

The defendant owns and operates "articulated trains" which have between adjacent cars cylindrical vestibules of the same general type, but resting, not upon the car platforms, but upon the bolster by means of a central knob fitting into a recess to receive it. Thus it may rotate upon the bolster without touching either platform and would do so but for a device to keep it in registry with the truck movements. In one form this is done by means of two rods passing through the floor of the vestibule and through opposite ends of the bolster, the two being pressed together by means of springs upon the rods. In the second form these rods and springs are replaced by brackets fastened to the bottom of the vestibule floor on either side

of the bolster at each end, limiting rotation of the vestibule upon its knob.

The ends of the defendant's car platforms are concave and circular, the curves being of the same radius as the vestibule and centered on its own center, the notion being that as the cars turn upon their pivots they will substantially follow the curve of the circumference of the vestibule floor, as indeed they do. Below the end of each car platform, and extending underneath the vestibule floor, runs a concave bracket extending out a few inches and having a clearance with the floor of less than half an inch. This engages the bottom whenever the platforms are turned either on their longitudinal or transverse axes, but it does not support the vestibule, nor is it intended to do so. Its purpose apparently is to prevent excessive oscillation of the vestibule.

■ It seems to us that the claims in suit are not infringed by either of these forms. The question of course depends upon the fair meaning of the language used, read as it must be on the art as it stood. Claims one, two, four and five certainly contemplate a vestibule which shall be supported by the platforms, which the defendant's vestibule is not. The fact that the brackets will engage the floor when the platforms turn on either axis does not make them its support. The bolster of the truck does that. Even when the brackets do engage they cannot be said substantially to support the vestibule; rather they tend to displace it from its support upon the bolster. Claims three and six speak of the vestibule as "overlapping" the platform and literally the defendant's vestibule does this, but we are not concerned with verbal correspondence. The disclosure presupposed that the vestibule shall ride or "float" upon the platforms and the defendant in carrying it otherwise does not functionally adopt anything disclosed.

Claims nine, ten and eleven do not contain this feature but are limited to the means for securing registry between the vestibule and the truck. The plaintiff insists that they cover a vestibule no matter how it is supported. The defendant's second form does not in any event infringe claim eleven, but we pass the distinction because we think that the claims must be limited to the disclosure. We are in some doubt whether if they are to cover a vestibule riding upon the bolster, the specifications would be adequate, but that question too we may pass because of Raymond's patent, which would broadly anticipate the claims unless they are limited. That patent, No. 376,907, was for an articulated train in this sense, that although each car had two four-wheel trucks, the patent

disclosed how these might lock together to form one truck of eight wheels upon which adjacent car ends would swivel. Between the two cars was set a vestibule made up of a floor with two straight and two concave sides, doors on the straight sides and a roof. The pivots on which the car platforms turned upon the truck were set well back from the ends and outside the circumference of the vestibule floor. It was for this reason necessary that the ends of the platforms should be convex and the corresponding edges of the floor concave, else they would engage as the truck and the platform made an angle. As the pivot was set at the centre of the circle formed by the edge of the platform and the concave edge of the floor was of substantially the same radius and centre, when the car pivoted on the truck the platform would rotate clear of the floor, though doubtless some clearance was desirable for safety. This at any rate was the design and the evidence is not sufficient to prove that the disclosure was inoperable.

The vestibule floor was in two pieces, one half fastened to each half of the truck. When the two halves were joined together as described, the floor became single and was attached to the truck so that it must follow its movements on the track. It is true that it was not "detachably" connected as prescribed in claim ten, or attached by adjustable rods as in claim eleven, but claim nine, on which the plaintiff chiefly relies, appears to us to have been anticipated, assuming that the vestibule need not "float" upon the platforms. The important thing was to secure the registry of vestibule and truck, and this Raymond had fully grasped and disclosed, though his means of articulating the cars was quite different. Nor do we think that the fact is relevant that Raymond's vestibule was not cylindrical or of steel. The claims say nothing of the kind and the specifications (page 2, lines 34–37), expressly disclaim any such limitation.

Claim nine must therefore be limited to the disclosure if it is to survive, and the same is true as well of claim ten, because Raymond's vestibule floor appears to be fastened only by the bolts, $n$, $n'$, which lock the connecting bars, $J$, $J'$, in place. When these are taken out the vestibule is detached. Moreover, as to both claims ten and eleven it appears to us impossible to say that if claim nine must be limited to a vestibule carried by the platforms, they need not. The differences are of trivial details of structure which can hardly of themselves support a patent. The issue is important only as to the defendant's first form in any case, and we are not disposed to treat such trifles seri-

ously. Therefore we agree with the district judge in his disposition of the first patent. ▮ Ellis' patent disclosed the same articulated train as Elliott, but covered something else. A car carried upon two single pivots at the extreme of either end is obviously in unstable equilibrium and something must be done to keep it from falling on its side; the rigidity of the vertical end of the trunnion is not enough. To insure against its breaking and hold the cars upright Ellis used the connecting vestibules which he necessarily assumed to be structurally rigid enough for the purpose. He fastened the floor of the vestibule at either end of the bolster firmly to that member by a rod passing through each end with heavy springs which should insure their contact save as the springs gave. As the floor overlay the ends of the platforms, it resulted, to the extent that the springs would hold, that the two car platforms and the vestibule became a single unit. Torques in the system so formed would then be taken up and corrected by the springs. This appears to have been in practise enough for light equipment, and the patent has gone into some use.

The defendant however uses trains of heavy construction, for the substance of whose equilibrium it relies upon quite another contrivance; heavy two-armed leaf springs on either side of the truck which extend up and engage the under sides of the car platforms at some distance back from where the trunnions fit into their sockets. Nevertheless, in its first design it also clamped the floor of the vestibule rigidly to the bolster by rods and springs as has already been described. The vestibule floor, as we have said, did not rest upon the platforms, and if that were all, there could have been no pretense that it used Ellis's disclosure. However, the brackets which extended below the floor with a small clearance and which showed marks of abrasion from use, repeatedly touch the floor as the cars oscillate laterally.

It is apparent, therefore, regardless of the superior power of the side leaf springs, that if the car platform tilts laterally through only a slight angle, it engages the floor of the vestibule, and that, to the extent of the power of the springs holding the bolster and vestibule together, its further movement is checked. Apparently the purpose of the brackets is rather to prevent inordinate lateral movement of the vestibule—at least so the patent says under which the defendant's equipment is made—but that can make no difference. The converse result is what the patent in suit claims, and the de-

fendant's design embodies it by so near a means as to infringe. This first form the defendant has apparently abandoned, so that the question is at most only one of damages or profits. Though the infringement may be insubstantial and result in small or nominal damages, we do not see how we can avoid holding that strictissimi juris the defendant has infringed.

It is true that neither Elliott nor Ellis shows a way of supporting the vestibule upon the platforms. As we have already suggested, we are in some doubt whether to say that the alternative was plain enough to allow it as an equivalent. However, it seems on the whole that since, at least as to Ellis, the nub of the matter lies in the restraining action of the vestibule upon the brackets, we should hold that the invention has been appropriated. Verbally we are not disposed to mince the words, "partly positioned over the platforms" of claim one, or "overlaying" in claim two, or "positioned to overlap" in claim seven. As to the first design the decree below is reversed and the plaintiff may take an injunction.

In the defendant's second form it abandoned any springs between the vestibule floor and the bolster, and substituted cushioning springs between the sides of the cars and the upright sides of the vestibule to hold it in place. The vestibule, though borne by the bolster, and kept in registry with its movements on the track, was free to oscillate upon it. However, it is true that the cars and the vestibule were in this way bound into a single system, and it is also true that the ends of the bolster would serve to check any lateral movement, so far as the lateral momentum of the whole did not prevent. While it is true that the design in this way accomplished something of the same result, the means used were totally different from any disclosed. We think therefore that while the district judge was wrong as to the defendant's first design, he was right as to the second.

▮ Elliott's second patent, the last of the three, was directed to the form of the pivots by which the cars were held to the single truck. At the extreme end of each platform, which was brought to a rounded point, was set a heavy metal piece, capable of bearing the weight of that end. Vertically depending from this was a heavy bolt or trunnion with a hemispherical end. Each trunnion entered its separate cup-shaped socket in which it could freely rotate in two planes, thus accommodating both platform and truck to curves, changes in grade and "banking" of the rails. The trunnions had shoulders just

above their hemispherical ends and were set close together. Between them and over the shoulders passed a heavy bolt which was anchored on either side in a flange extending up from the frame of the socket, and this kept them from leaving their sockets.

The defendant supported its cars also upon trunnions, though of heavier construction, as its equipment demanded. It had but one socket into which both fitted, each having in substance a bearing surface of about a quarter of a sphere. The weight of the cars set up a thrust of each trunnion against the other, which was taken up upon a small bearing surface on the end face of each, making them functionally a single member to resist longitudinal stresses, but leaving each free to rotate in two planes like the disclosure, and to give equal accommodation to curves, grades, and the like. About both trunnions was passed a heavy cable, bearing not upon the inner surface of each, but upon plates set back of them, binding together the platforms in the event that either trunnion should break. The details of this construction we think it unnecessary to describe.

"Articulated trains" were indeed very old; they go back to the middle of the nineteenth century, and the pivoting devices of the car platforms were of various forms. A common one was to have one end piece overlie or interpenetrate the other, both being supported on a common bearing plate, to which they were secured by a kingbolt. This was the form disclosed in the patents to Cooper and Way. Raymond had two pivots and two separate plates, each held to the truck by its own kingbolt. These are all distant from Elliott's disclosure, to which the nearest is Rounds, 884,420, which appeared in 1908. He supported the two adjacent car ends upon "pivots" which might be "of usual construction." An under and an upper bearing plate is disclosed, but we are left to surmise how these are to be held together, save as appears in the phrase quoted. Figure three certainly suggests that the bearing plates on the truck have recesses into which it was probably intended that the upper plates should lock by means of an undisclosed male member. But even if we are so to conjecture, the best we can do is to say that the trunnion of each pivot had vertical sides and a flat end which fitted closely into the recess or socket. Such a design was incapable of accommodating itself to variations in grade of the track or to "banking." Though it may be that Rounds' disclosure forbids giving to Elliott's claims broad scope, it does not invalidate them if they be confined to a trunnion with hemispherical end. To that point at any rate the patent is valid and should

cover apparatus like the defendant's which operates in the same way, though there is but one socket and each trunnion bears against the other horizontally—an improvement no doubt, but still one which uses the invention.

The two locking devices are, however, of very different construction, and in so special a detail there is no room for much equivalency. Directly at any rate the cable, passed around the added members, does not hold the trunnions in place. So far as appears, the purpose was not to hold them at all, but to keep the car ends together if either broke. Even if incidentally this might secure them in their socket, which is not altogether clear, it did so by quite another means than that disclosed. Certainly there could be no invention merely in desiring to lock the trunnions in place.

Hence we say that the trunnion claims are infringed and the locking claims are not. We do not forget that claims one, three and five each contemplate two sockets and that the defendant has only one. Claim six verbally has only one socket and is a little better suited to cover the defendant than the others. But we do not stand on the language used, for while, as we have indicated, the patent is not a pioneer, it is, like all others, entitled to some scope beyond the literal language of the claims, between which it seems unnecessary to distinguish in this regard. We reverse the decree, therefore, as to claims one, three, five and six, and affirm it as to claims two, four and seven.

Decree affirmed as to Elliott's first patent; affirmed as to Ellis' patent in respect of the defendant's Type B; reversed as to Ellis' patent in respect of Type A, and an injunction granted as to claims one, two and seven; affirmed as to Elliott's second patent in respect of claims two, four and seven, and reversed in respect of claims one, three, five, and six and an injunction granted.

### On Petition for Rehearing.

PER CURIAM. Our reconsideration of this case confirms our original conclusion. The specifications are wholly blind, except to say that the pivots are to be of "usual construction," an issue not litigated and not to be summarily decided by recourse to standard works ex parti. We gave the defendant the benefit of a doubt by assuming that Rounds showed a trunnion; this we interpolated quite gratuitously and in doing so apparently we went too far, instead of not going far enough, though we have only the figures to guide us, and figures alone are not enough. Figure 5 shows two flat bearing plates resting on each other with a ball run-

way between them. This would of course have been absurd if there was nothing more, but they appear to be held together by a kingbolt, indicated in dotted lines on the figure. The runways are also drawn in Figure 3 without any suggestion of a socket. All this is of course pure speculation, but that only makes in the plaintiff's favor, for an anticipation must be plain.

Again the rack and pinion, 40, 41, show that no lateral movement was expected. These two members were to be always in conjunction, and the platform must remain in parallel plane to the truck.

By "usual construction" Rounds apparently meant the construction of Gresley, Driggs, Raymond, Cooper, and Jakobs, who all disclosed kingbolts. It was indeed "a," if not "the," "usual construction" for articulated trains at that time.

Petition denied.